

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00263-CR

Miguel **GONZALES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR0046
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:          Rebeca C. Martinez, Justice
                 Patricia O. Alvarez, Justice
                 Luz Elena D. Chapa, Justice

Delivered and Filed:  October 31, 2018

AFFIRMED

Miguel Gonzales appeals his convictions for aggravated robbery and aggravated kidnapping, arguing the evidence is insufficient to support the convictions, the trial court erred in admitting his photograph from the photo lineup, and the State failed to disclose exculpatory evidence. We overrule Gonzales's issues and affirm the trial court's judgment.

## BACKGROUND

David Escobedo testified that he had been working in San Antonio and Austin during the three months before the aggravated robbery and kidnapping, and he had saved $3,600 which he

planned to send to his family in Mexico. When his job at the Travel Inn in San Antonio ended, Escobedo needed a place to stay while he looked for a new job and an apartment. An acquaintance, Gonzales, offered to let Escobedo sleep on the couch at his two-bedroom apartment where he lived with his wife and two children. During the one to two-week period he stayed with Gonzales, Escobedo stated he twice gave Gonzales money to help with the rent and also bought food. Escobedo testified he took the money out of his wallet in front of Gonzales, and gave him $100 both times.

Escobedo testified that, at about 7:00 a.m. on June 3, 2015, he was lying on the couch in the living room when he saw Gonzales go to the front door and let a man into the apartment. Escobedo testified that Gonzales and the unknown man began attacking him, hitting him in the head and face with a gun and with their fists. They moved Escobedo off the couch and made him kneel down next to it. Escobedo stated that Gonzales handcuffed his hands behind his back "while they were hitting me." Escobedo stated that his face was bleeding and they covered him "with a cloth over [his] head" when they placed him on his knees with his "head in the sofa face down." On cross-examination, Escobedo clarified the cloth was over his head, not over his eyes or face. The men searched the pockets of Escobedo's clothing and the two garbage bags containing his clothes. Escobedo believed they were "looking for money." Escobedo stated that he had $400 in his wallet on his person and the rest of the money was hidden inside his clothing and the bags.

Escobedo testified that Gonzales and the other man found his money, but they wanted more. Gonzales used his cell phone to call "Simon," a person that both Escobedo and Gonzales knew. Gonzales took the rag off Escobedo's head and instructed him to ask Simon for "$2,000 as a loan." Escobedo testified, "I had to do it . . . because they were pointing the gun at me." On cross-examination, Escobedo specified that it was Gonzales who was holding the gun on him at that time, but he and the other man would pass the gun back and forth. Escobedo explained that

he could see the bullets and hear them chambering the gun, stating, "they would chamber it around. They would look at the bullets and they would reload it again." Simon replied that he did not have the money. Escobedo testified that Gonzales told him "they were going to kill me and they were going to throw me away." Escobedo stated he begged them to let him go and promised he would return to Mexico. Escobedo testified that Gonzales's wife Leslie and the children were in the bedrooms and he called out for help, but no one came to help him.

Escobedo testified that he was then taken out of the apartment, along with his bags of clothing. Escobedo stated he did not want to go with them and just wanted them to let him go. One of the men hung an orange construction vest over his shoulders to cover the handcuffs while the other man went to get the truck; Escobedo could not recall which task Gonzales performed. Before taking Escobedo outside the apartment, they used the cloth to clean up Escobedo's face "[b]ecause my nose was busted and the eyebrow and my lips, the mouth." As Escobedo walked out of the apartment, the man with him pressed the gun against his back underneath the vest and told him not to shout or try to run. Escobedo stated there were people around outside the apartment and he made some gestures "that something was going on" but no one did anything. Gonzales drove the truck and Escobedo sat in the front seat, while the other man was "placing the gun in my stomach in the back part" from the back. Escobedo testified they told him "we were going to go look for Simon." Escobedo recalled that they placed the cloth over his head again while they were driving in the truck. Escobedo testified he could tell they stopped at the Travel Inn because he saw the sign. He stayed inside the truck in the parking lot. His handcuffs were removed there, but the other man kept the gun pointed to his back. Gonzales then drove to Simon's apartment and Gonzales told Escobedo they were going to rob Simon. Escobedo testified that when he got out of the truck at Simon's apartment, "they were still pointing the gun at me. And I didn't want to -- I didn't want to keep on walking because I felt they were going to shoot at me at any moment."

Escobedo walked toward the apartment complex as Gonzales and the other man remained inside the truck and watched him. Escobedo stated he ran into a downstairs apartment where the door was open and maintenance was being performed. He ran through and jumped out a back window. Escobedo then ran upstairs to Simon's apartment, where he knocked, and asked Simon to come outside. Escobedo told Simon to get out of the apartment because he was in danger of being robbed. Simon had four or five friends visiting at his apartment. When Gonzales saw all the people there at Simon's apartment, he drove away with the other man in the truck.

Escobedo asked Simon to take him to the doctor, which he did but the doctor was not in at that time. Because he was still afraid, Escobedo asked Simon to drive him to Austin. Escobedo testified that while he and Simon were driving to Austin, Gonzales called Escobedo and warned him not to say anything to the police or "he was going to look for me." Simon dropped Escobedo off at a pharmacy in Austin and gave him $20 so he could buy bandages and medical supplies. Escobedo then walked to his friend Jose's house nearby. When he learned what had happened to Escobedo, Jose called the Austin Police Department, but they referred the call to the San Antonio Police Department. Escobedo was informed he would have to return to San Antonio to make a report. The police instructed Escobedo to take photos of his injuries at that time, and informed him they would take additional photos when he came in to the police station. Escobedo returned to San Antonio and made a police report naming Gonzales and providing his address; he did not know the other man and could only provide a general description. Escobedo later identified Gonzales from a photo lineup at the San Antonio Police Department. Gonzales was subsequently indicted for the aggravated robbery and aggravated kidnapping of Escobedo.

Escobedo testified at trial as set forth above. In addition, Jose Vizcalla testified he had known Escobedo since 2012, and Escobedo lived with him in Austin before he moved to San Antonio in 2015. When Escobedo subsequently returned to Vizcalla's home in Austin, Escobedo's

face was "all bruised" and he had injuries, was crying and very sad. Escobedo refused to go to the hospital. After Escobedo told Vizcalla what happened to him, Vizcalla encouraged Escobedo to contact the Austin police, even though Escobedo was scared of being deported to Mexico. Vizcalla called "311" to inquire how to report the matter, and was transferred to "911" in San Antonio where he was told that Escobedo had to come to San Antonio to make a police report. Vizcalla drove Escobedo to the San Antonio police station on two occasions to make a report and to talk to a detective.

San Antonio Police Detective German Fuentes testified he was the first officer to make contact with Escobedo and he observed that Escobedo "had some apparent injuries to his face" such as "bruisings and scratches." Fuentes took Escobedo's report in which he described the robbery and its location and named Gonzales as one of the two perpetrators. Fuentes testified that Escobedo was concerned for his safety, appeared to be genuine, and provided a logical timeline and detailed account. He was accompanied by a friend who drove him down from Austin. Detective Fuentes believed the crimes of aggravated robbery and aggravated kidnapping had been committed against Escobedo, and notified a follow-up unit, and requested that another detective take photographs of Escobedo's injuries. State Exhibits #1-9 consisting of photographs showing cuts and bruises on Escobedo's face and head were admitted into evidence.

Detective Isidro Diaz testified he located Gonzales by tracking down the truck, which had been reported stolen by Gonzales's ex-wife. Diaz then prepared a photo lineup that included Gonzales. Because Detective Diaz was off the day Escobedo came in, Detective Jose Orozco testified he showed the photo lineup to Escobedo by individually displaying each of the six photos in a manner which enabled only Escobedo to view the photograph. Escobedo picked out photograph #4 of Gonzales as the perpetrator. Escobedo then made a sworn statement about the incident to another detective.

Veronica Alcala, the mother of two children with Gonzales, testified that Gonzales brought Escobedo to her home to stay there for two to three weeks. Escobedo arrived with three to four other people and they all stayed together in a third bedroom. She asked Escobedo to leave due to the number of strangers coming into and out of her home while her children were there. When Alcala took Escobedo's bags over to Leslie Gonzales's home, she saw Gonzales standing at the door talking to Escobedo, who was "talking smack." She dropped off the bags and left. State Exhibits #15A through 17A were admitted as fair and accurate copies of redacted audio recordings of phone calls made by Gonzales while he was in jail. Alcala testified that she did not feel that Gonzales was trying to tell her what to say or to influence her testimony during the jail phone calls. Alcala stated she did not recall Gonzales saying that he told Leslie [Gonzales] what to say or saying that he would kidnap Alcala. Alcala testified that if Gonzales had referred to kidnapping her, he was joking.

Finally, the State called Gonzales's wife, Leslie Gonzales, who acknowledged receiving the jail calls from Gonzales during the trial, but denied that Gonzales tried to tell her how to testify or encouraged her to tell a lie. Leslie testified that what really happened on June 3, 2015 was that Escobedo and Gonzales had a confrontation after Gonzales told him he could no longer stay there and threw Escobedo's bags out the door, causing a gun to fall out of Escobedo's duffel bag. According to Leslie, Gonzales then went back inside with his family and locked the door against Escobedo. Leslie testified that she believed Escobedo was with the cartel and she was afraid of him. Leslie also stated that Escobedo never gave her any money for staying there or offered to buy food.

Gonzales did not testify and called no defense witnesses during guilt/innocence. Photographs of Escobedo's injuries were admitted as Defense Exhibits #2 through 4.

The jury convicted Gonzales of the aggravated robbery and aggravated kidnapping of Escobedo.[1] Gonzales elected to be punished by the trial court. After finding the enhancement allegations in the indictment true, the trial court sentenced Gonzales to forty-five years' imprisonment on each conviction, with the sentences to run concurrently. Gonzales appealed.

### SUFFICIENCY OF THE EVIDENCE

In his first issue, Gonzales challenges the sufficiency of the evidence to support his convictions for aggravated robbery and aggravated kidnapping. In reviewing the sufficiency of the evidence, we determine whether, viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The essential elements of the crime are the elements of the offense as defined by a hypothetically correct jury charge, which is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law "as authorized by the indictment" consists of the statutory elements of the offense as modified by the charging instrument. *Id.*; *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

In determining whether the State met its burden under *Jackson v. Virginia*, we compare the elements of the crime, as defined by the hypothetically correct jury charge, to the evidence admitted at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014). In conducting this analysis, we defer to the jury's assessment of the credibility of the witnesses and the weight to be

---

[1] There was no instruction on party liability in the jury charge.

given to their testimony. *Brooks*, 323 S.W.3d at 899; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (jury may draw reasonable inferences from the basic facts to the ultimate facts). We determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). We presume that the jury resolved any inconsistencies in the evidence in favor of the verdict and defer to that resolution. *Id.* at 448-49; *Curry*, 30 S.W.3d at 406. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas*, 444 S.W.3d at 8 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). In assessing sufficiency, we consider all of the admitted evidence, even if it was improperly admitted. *Id.*

### *Aggravated Robbery*

A person commits aggravated robbery if he uses or exhibits a deadly weapon while committing robbery as defined in Penal Code section 29.02. TEX. PENAL CODE ANN. § 29.02(a)(2). "Robbery" is committed when, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. *Id.* § 29.02(a)(1). "Theft" occurs when a person unlawfully appropriates property with intent to deprive the owner of the property. *Id.* § 31.03(a). "Appropriation" is unlawful when it is without the owner's effective consent. *Id.* § 31.03(b)(1).

Count I of the indictment alleged that, on or about June 3, 2015, Gonzales, while in the course of committing theft of property and with intent to obtain and maintain control of said property, used and exhibited a deadly weapon, namely: a firearm, and intentionally, knowingly, and recklessly caused bodily injury to Escobedo by striking him with the firearm. The jury charge tracked the language of the indictment and instructed the jury on the above-cited definitions.

*"In the Course of Committing Theft"*

Gonzales first argues the evidence is insufficient to prove the theft element of robbery. He asserts that there was no evidence to corroborate Escobedo's testimony that he (Escobedo) in fact had money in his pockets and in his packed clothing, and that Gonzales actually appropriated the money. Gonzales points out that no stolen money was ever recovered.

Escobedo testified he had $400 in his wallet and the rest of his $3,600 savings hidden inside his packed clothing at the time of the assault, and that Gonzales and the other man "found" the money. The jury was entitled to assess Escobedo's credibility and to believe his testimony that a theft occurred. No evidence was presented to contradict Escobedo's testimony that he had money and that Gonzales and the other man took his money.

Even so, the actual commission of a theft is not required to establish the offense of robbery, or aggravated robbery. *Watson v. State*, 532 S.W.2d 619, 622 (Tex. Crim. App. 1976). This is so because the gravamen of robbery or aggravated robbery is the defendant's assaultive conduct against the victim, not the theft. *Ex parte Denton*, 399 S.W.3d 540, 546 (Tex. Crim. App. 2013); *Jones v. State*, 323 S.W.3d 885, 889 (Tex. Crim. App. 2010). As the jury was properly instructed, the robbery element of "in the course of committing theft" as defined in the Penal Code means "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." TEX. PENAL CODE ANN. § 29.01(1). Thus, a completed theft is not required to establish a robbery; an attempt to commit theft can suffice. *Id.*; *Burton v. State*, 510 S.W.3d 232, 238 (Tex. App.—Fort Worth 2017, no pet.). Escobedo testified he gave Gonzales $100 on two occasions while he was staying at his apartment and had taken the money out of his wallet in front of Gonzales, which supports a reasonable inference that Gonzales knew or thought that Escobedo had money with him. Escobedo testified that Gonzales and the other man were "looking for money" when they searched his person and his bags during the physical assault. In

addition, Escobedo testified that Gonzales forced him to ask his friend Simon for $2,000, while Gonzales held the gun pointed at Escobedo. Thus, the evidence, viewed in the light most favorable to the verdict, is sufficient to prove that Gonzales either attempted to commit a theft, or completed a theft, by unlawfully appropriating Escobedo's money without his consent and with the intent to deprive Escobedo of the money.[2]

*Used or Exhibited a Deadly Weapon: a Firearm*

Gonzales next argues there is no evidence to prove that he personally used or exhibited the gun during the robbery. The use of a deadly weapon is an essential element of aggravated robbery. *Wright v. State*, 591 S.W.2d 458, 459 (Tex. Crim. App. [Panel Op.] 1979). Gonzales contends there are "no affirmative links" between him and the gun, beyond his "mere presence" during the robbery. While Escobedo testified that the other man had the gun when the assault first began, he specifically testified that it was Gonzales who pointed the gun at him when he (Gonzales) demanded that Escobedo obtain $2,000 from Simon. Escobedo also testified that Gonzales and the other man were passing the gun back and forth at the apartment. We conclude there was sufficient evidence that Gonzales "used or exhibited" the gun during the robbery.

Gonzales also asserts the evidence does not prove that the gun used during the robbery met the definition of a "firearm." A firearm is a per se deadly weapon. *Id.*; TEX. PENAL CODE ANN. § 1.07(a)(17). The jury charge defined a "firearm" as "any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use." *See* TEX. PENAL CODE ANN. § 46.01(3). Escobedo testified that Gonzales and the other man were hitting him in the head and face with "a gun" and their fists, and that the gun was "black." Escobedo also stated he could "see the bullets"

---

[2] Gonzales does not challenge the sufficiency of the evidence to establish the intent element of the robbery. *See* TEX. PENAL CODE ANN. § 29.02(a)(1).

as they removed and reloaded them, and he could "hear the chambering" of the gun. Finally, Escobedo testified that Gonzales told him they were going to kill him, and he was afraid he would be shot and killed even as he was walking toward Simon's apartment. Testimony using the term "gun," "pistol," or "revolver" has been held sufficient to authorize the jury to find that a deadly weapon was used. *Wright*, 591 S.W.3d at 459. Escobedo's testimony contained sufficient details to support a reasonable inference by the jury that the gun used was a lethal firearm. We therefore conclude the evidence is sufficient to support the jury's finding that the gun used qualified as a firearm, as defined in the jury charge.

*Complainant Escobedo Was Not Credible*

Finally, Gonzales contends that Escobedo's testimony was inconsistent, uncorroborated, and not credible. He cites to Escobedo's testimony that a cloth was placed over his head during the incident, arguing that Escobedo therefore could not see the gun or who had possession of the gun and that his testimony about seeing the bullets and seeing Gonzales point the gun at him is unbelievable. Gonzales also stresses that there is no physical evidence to support Escobedo's version of events in that no stolen money was recovered and no handgun was found. Gonzales also suggests that Escobedo's injuries as depicted in the photographs do not look serious enough to corroborate Escobedo's testimony about the severity of the physical assault.[3] In sum, Gonzales argues that the version of events presented by Veronica Alcala and Leslie Gonzales is more credible than Escobedo's version.

---

[3] Gonzales states in his brief that the evidence was insufficient to prove Escobedo suffered "serious bodily injury" during the robbery. He later acknowledges that the indictment and jury charge only required proof that Escobedo suffered "bodily injury." To the extent Gonzales intends to challenge the sufficiency of the evidence to support a finding of "bodily injury," defined as physical pain or any impairment of physical condition, we overrule his argument based on Escobedo's testimony and the photographs. *See* TEX. PENAL CODE ANN. § 1.07(a)(8).

The jury was essentially presented with two narratives of what took place on June 3, 2015. It was the jury's role to evaluate the witnesses' credibility, including Escobedo's, and to resolve conflicts between the witnesses' testimony. *Burton v. State*, 510 S.W.3d 232, 239 (Tex. App.—Fort Worth 2017, no pet.). Under the applicable standard of review, we presume the jury resolved any inconsistencies in the evidence in favor of the verdict and defer to that resolution. *Murray*, 457 S.W.3d at 448-49. We also determine whether the necessary inferences are reasonable based on the cumulative force of the evidence, viewed in the light most favorable to the verdict. *Id.* at 448. The jury was presented with evidence that Gonzales repeatedly hit Escobedo in the head and face with a gun and his fists, handcuffed him, searched his clothes and bags "looking for money" and took the money, pointed a gun at Escobedo while instructing him to ask Simon for $2,000 more, and threatened to kill Escobedo and "throw him away." There was also evidence that Gonzales threatened to harm Escobedo during the weeks after the robbery. Escobedo's account was corroborated by the testimony of Jose Vizcalla who stated Escobedo's face was "all bruised" and he had other injuries when he showed up in Austin and the testimony of Detective German Fuentes who observed "apparent injuries to his face" when he interviewed Escobedo, as well as the photographs showing cuts and bruises on Escobedo's face. In addition, Escobedo testified he could not open his jaw to chew for a week. With respect to the cloth, Escobedo testified it was placed over his head, "not over his eyes or face," and was used to clean up the blood from his head and face before he left the apartment. Escobedo also stated the cloth was removed at times during the robbery, such as when he spoke to Simon while Gonzales pointed the gun at him, and then was replaced inside the truck while they were driving.

We conclude the evidence is sufficient to support the jury's finding that Gonzales committed aggravated robbery against Escobedo.

*Aggravated Kidnapping*

A person commits the offense of aggravated kidnapping if he "intentionally or knowingly abducts another person with the intent to . . . terrorize him or a third person" or "intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense." TEX. PENAL CODE ANN. § 20.04(a)(5), (b). In relevant part, the Penal Code defines "abduct" as "to restrain a person with intent to prevent his liberation by . . . secreting or holding him in a place where he is not likely to be found." *Id.* § 20.01(2)(A). To "restrain" means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). Finally, restraint is "without consent" when it is accomplished by "force, intimidation, or deception." *Id.* § 20.01(1)(A).

Count II of the indictment charged Gonzales with alternate means of committing aggravated kidnapping as follows:

Paragraph A

On or about the 3rd Day of June, 2015, MIGUEL GONZALES . . . with the intent to terrorize David Escobedo, did intentionally and knowingly abduct David Escobedo by restricting the movements of David Escobedo without his consent so as to interfere substantially with his liberty, by moving him from one place to another, with the intent to prevent his liberation, by secreting or holding him in a place where he was not likely to be found;

Paragraph B

On or about the 3rd Day of June, 2015, MIGUEL GONZALES . . . did then and there intentionally and knowingly abduct David Escobedo by restricting the movements of David Escobedo without his consent so as to interfere substantially with his liberty, by moving him from one place to another, with the intent to prevent his liberation, by secreting or holding him in a place where he was not likely to be found, and [Gonzales] did then and there use or exhibit a deadly weapon, to wit: a firearm, during the commission of said offense;

The jury charge tracked the language of the indictment, submitting Paragraphs A and B as alternatives, and contained the above-stated definitions.

*Element of Abduction*

Gonzales's main challenge to the sufficiency of the evidence to support his aggravated kidnapping conviction goes to the element of abduction and the required restraint of Escobedo's liberty. Gonzales asserts there is no evidence that he "restricted the movements of Escobedo without his consent so as to interfere substantially with his liberty, by moving him from one place to another, with the intent to prevent his liberation, by secreting or holding him in a place where he was not likely to be found." Gonzales concedes that the evidence shows Escobedo was handcuffed, but stresses that the handcuffs were removed by a third person at the Travel Inn and characterizes Escobedo as "then free to leave with all his belongings including his cell phone." Gonzales argues that, rather than evincing an intent to prevent Escobedo's liberation, this evidence shows his intent to facilitate Escobedo's liberation and disproves that Escobedo was "moved from one place to another with the intent to prevent his liberation." Gonzales does not address Escobedo's testimony that he was then driven to Simon's apartment where he was sent upstairs to get the $2,000 from Simon. Gonzales also asserts there was no evidence that Escobedo was secreted or held in a place where he was not likely to be found, citing to Escobedo's testimony that Gonzales's wife and children were present in the apartment during the aggravated robbery and that numerous people were outside at the apartment complex when Escobedo was taken outside to the pickup truck.

Gonzales's argument views the evidence and inferences in the light most favorable to him, rather than in the light most favorable to the jury's verdict as required by the applicable standard of review. *See Jackson*, 443 U.S. at 319; *see also Brooks*, 323 S.W.3d at 899. Viewing the evidence under the appropriate standard, the jury could have reasonably found that Gonzales

"abducted" Escobedo. First, Escobedo's testimony that he was beaten and handcuffed while being robbed and threatened with a gun inside Gonzales's apartment supports a finding that while inside the apartment his movements were restricted without his consent in substantial interference with his liberty. Escobedo's testimony also shows his movements and liberty were still restricted when he walked to the truck as the handcuffs were on, the gun was pressed into his back underneath the vest, and he was told not to shout or try to run. The same restrictions on Escobedo's movement and liberty continued while he was riding inside the truck—the handcuffs were still on, his head was covered again, and the other man was pressing the gun against Escobedo's back. This evidence also shows that Escobedo was moved from one place to another, i.e., from the apartment to the truck, with the intent to prevent his liberation by secreting and holding him in a place where he was unlikely to be found, i.e., inside the truck. According to Escobedo, he was not "liberated" at the Travel Inn. While the handcuffs were removed there by a third person, Escobedo was not allowed to exit the truck. Instead, Gonzales then drove him to Simon's apartment where he was permitted to exit the truck with his bags and walk up to Simon's apartment; however, Escobedo testified the gun was still pointed at his back and he was afraid he would be shot at any moment and killed.

The offense of kidnapping does not require that the defendant restrain the victim for any particular period of time, or that the victim be moved any particular distance. *Santellan v. State*, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997); *Brimage v. State*, 918 S.W.2d 466, 475 (Tex. Crim. App. 1994) (moving victim from room to room while attempting to kill her was sufficient to prove restraint). The requirement of "substantial interference with the victim's liberty" in section 20.01(1) does not require any quantitative amount of interference. *Brimage*, 918 S.W.2d at 478. Further, the requirement of "secreting" or "holding the victim in a place where he is not likely to be found" is part of the *mens rea* or culpable mental state of the offense; the *actus reus* of the

offense is the "restraint." *Id.* at 475-76. Once restraint is established, the offense of kidnapping is complete when the actor evidences a specific intent to prevent liberation. *Id.*; *Megas v. State*, 68 S.W.3d 234, 240 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

Viewing the evidence in the light most favorable to the jury's verdict, the evidence is sufficient to support the jury's finding that Gonzales "abducted" Escobedo within the meaning of sections 20.01 and 20.04.

*Intent to Terrorize or Use/Exhibition of a Deadly Weapon: a Firearm*

In addition to finding that Gonzales abducted Escobedo, to convict on aggravated kidnapping the jury was required to find either that Gonzales acted with the intent to terrorize Escobedo or that Gonzales used or exhibited a deadly weapon, to wit: a firearm, during the kidnapping. With respect to use or exhibition of a deadly weapon, Gonzales makes the same argument as under aggravated robbery, asserting there is no evidence to prove the gun used was a "firearm." We reject this argument with respect to the aggravated kidnapping offense for the same reasons cited above.

Gonzales also argues there is no evidence that he acted with the intent to terrorize Escobedo. However, Escobedo testified that around the time of the phone call to Simon, Gonzales threatened to kill him (Escobedo) and throw him away. At the time, Gonzales and the other man were chambering the gun, taking out and displaying the bullets, and then reloading the gun in front of Escobedo. Gonzales pointed the gun at Escobedo to encourage him to ask Simon for the $2,000. Further, the gun was pressed into Escobedo's back during the time he walked from the apartment to the truck and the entire time he rode inside the truck, even after the handcuffs were removed. Even after he exited the truck at Simon's apartment complex, Escobedo testified he was in fear of being shot and killed at any moment because the gun was still pointed at him as he walked toward Simon's apartment. Escobedo testified that Gonzales and the other man warned him "not to say

anything" both at the apartment and in the truck. They also told him that the police would not believe him because he was an illegal immigrant. During the week after the incident, Gonzales called and threatened Escobedo several times and also sent text messages when Escobedo stopped answering his calls. "He would tell me that he knew where I lived, and that he knew that I had talked to the police." Escobedo blocked Gonzales's calls and messages, and later changed his phone number. Even though these threats by Gonzales occurred after the incident, they tend to show what Gonzales's state of mind was with respect to Escobedo at the time of the aggravated kidnapping. Based on this evidence, the jury could have reasonably inferred that Gonzales acted with the intent to terrorize Escobedo when he abducted him.

We conclude the evidence is legally sufficient to support Gonzales's conviction of aggravated kidnapping.

### ADMISSION OF PHOTOGRAPH

Gonzales next argues the trial court abused its discretion by admitting his prior "mug shot" used in the photo lineup because its probative value was outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (trial court's ruling admitting evidence over Rule 403 objection is reviewed for abuse of discretion). Specifically, Gonzales contends the photograph is obviously a "mug shot" and the jury could infer from the photograph that he had a prior conviction. Gonzales raised that objection, along with others, during the testimony of SAPD Detective Isidro Diaz, who outlined the steps of his investigation that led to Gonzales becoming a suspect. Detective Diaz identified State Exhibit #13 as representing the six color photos of the six males's faces that were shown to Escobedo in the photo lineup and from which he identified Gonzales. In relevant part, Gonzales objected that any probative value from the photo was outweighed by the undue prejudice of the background showing him in an orange jumpsuit, indicating he was previously incarcerated. During a bench

conference on Gonzales's objections, the State presented an altered version of the single photo of Gonzales (State Exhibit #14) which had been transformed from a color photo to a black and white photo "to avoid any prejudicial effect in terms of them [sic] being in a jail uniform." When the trial court asked whether Gonzales had any objection to the single black and white photo of Gonzales (S-Exh. #14), defense counsel replied, "No objection on this one." The trial court then ruled the color photo lineup would not be admitted, but the single black and white photo of Gonzales (S-Exh. #14) showing Escobedo's handwritten identification would be admitted. When State Exhibit #14 was offered into evidence before the jury, defense counsel again stated, "No objection, Your Honor." Any error in the admission of the single black and white photo was therefore not preserved for appellate review. *See* Tex. R. App. P. 33.1(a); *see also Estrada v. State*, 313 S.W.3d 274, 302 (Tex. Crim. App. 2010) (when a defendant affirmatively asserts he has "no objection" to the admission of evidence, he waives his right to complain on appeal). Even if the issue had been preserved, Gonzales has not shown how he was harmed by the admission of the facial photograph converted to black and white to avoid showing him in an orange jail jumpsuit. *See* Tex. R. App. P. 44.2(b) (unconstitutional error is disregarded unless it affected the appellant's substantial rights).

### FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

Finally, Gonzales argues the State failed to disclose exculpatory evidence in violation of *Brady v. Maryland* and the Michael Morton Act, thereby depriving him of due process. *Brady v. Maryland*, 373 U.S. 83 (1963); Tex. Code Crim. Proc. Ann. art. 39.14(h), (k). Specifically, Gonzales refers to the photographs Escobedo took of his injuries on his cell phone, and Escobedo's statement during his testimony that he received threatening text messages and calls from Gonzales after the incident. Gonzales asserts in his brief that his defense counsel first learned of these items during Escobedo's trial testimony, and argues that, "all this evidence is material and additionally

potentially exculpatory, as these photographs, statements and text messages and phone logs could have been utilized by the defense to impeach David Escobedo." However, the record does not show that Gonzales preserved any error for review with respect to this evidence by raising an objection or requesting a continuance in the trial court; he also did not bring the matter to the trial court's attention in a motion for new trial. *See* TEX. R. APP. P. 33.1(a) (preservation of error requires party to make timely request, objection, or motion in trial court and obtain an adverse ruling). When *Brady* material is divulged during trial, the defendant's failure to either (1) object to the admission of the evidence based on a *Brady* violation, or (2) request a continuance, waives the error. *Boyd v. State*, No. 04-17-00193-CR, 2018 WL 3129463, at *8-9 (Tex. App.—San Antonio June 27, 2018, no pet.) (not designated for publication); *Williams v. State*, 995 S.W.2d 754, 762 (Tex. App.—San Antonio 1999, no pet.). A claim that the State's nondisclosure of evidence violated the Michael Morton Act must similarly be preserved and does not invoke systemic or constitutional rights. *Glover v. State*, 496 S.W.3d 812, 816 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Cook v. State*, No. 07-17-00160-CR, 2018 WL 1802658, at *6-7 (Tex. App.—Amarillo Apr. 16, 2018, pet. ref'd). Further, even if the issue had been preserved, the record here does not show that the referenced texts, calls, and photographs even existed at the time of trial, as Escobedo testified he had previously deleted the photographs and Gonzales's texts and calls from his cell phone. Escobedo stated that he deleted the information because, "I don't want to remember anything anymore," and the police took their own photographs of his injuries and he assumed the company would have the call log. Thus, there is nothing in the record to indicate such evidence was ever in the State's possession.[4]

---

[4] Similarly, Gonzales argues that Escobedo's trial testimony revealed the existence of a second and third statement made by him, which were not turned over to the defense. However, read in context, Escobedo's references to making three statements about the incident referred to his initial police report at the San Antonio Police Department, his subsequent sworn statement to a detective, and his description of the incident during an interview with his attorneys.

**CONCLUSION**

Based on the foregoing reasons, we overrule Gonzales's issues on appeal and affirm the trial court's judgment.

Rebeca C. Martinez, Justice

DO NOT PUBLISH

---

When asked whether Escobedo had given more than one sworn statement, the prosecutor repeatedly answered that the State only had the one statement Escobedo made to the San Antonio detective and had turned that statement over to the defense.